IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TOUCH AMERICA HOLDINGS, INC., et al., | ) | Bk. No. 03-11915 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Adv. No. 04-52935 (KJC) |
| ENTECH LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 04-1336-SLR |
| WESTMORELAND COAL COMPANY, | ) | |
| a Delaware corporation, and WESTMORELAND | ) | |
| MINING LLC, a Delaware limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## NOTICE OF SUBPOENA

TO:    Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE  19801

        PLEASE TAKE NOTICE that the supboena, attached as Exhibit A, has been

served upon KPMG, LLP.

Dated: April 27, 2005

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Christian Douglas Wright*

Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Christian Douglas Wright (No. 3554)
Matthew B. McGuire (No. 4366)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600

Co-counsel to the Plaintiff

# EXHIBIT A

AO88  (Del. Rev. 7/00) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

### SUBPOENA IN A CIVIL CASE

| | |
|---|---|
| In re:<br>TOUCH AMERICA HOLDINGS, INC., et al., Debtors | CASE NUMBER:  03-11915 (KJC)<br>United States Bankruptcy Court, District of Delaware |
| ENTECH LLC, Plaintiff,<br>　　　　　v.<br>WESTMORELAND COAL COMPANY, and<br>WESTMORELAND MINING LLC, Defendants | Adversary Proceeding No. 04-52935 (KJC)<br>C.A. No. 04-1336-SLR<br>United States District Court, District of Delaware |

TO:　　KPMG LLP
　　　　　c/o The Corporation Trust Company
　　　　　Corporation Trust Center; 1209 Orange Street
　　　　　Wilmington, DE  19801

☐　YOU ARE COMMANDED to appear in the United States District Court at the place, date,
　　and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |
| | |

☒　YOU ARE COMMANDED to appear at the place, date, and time specified below to testify to the topics listed in on the
attached Schedule A at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building; 1000 West Street, 17th Floor<br>Wilmington, DE  19801 | May 23, 2005 |

☒　YOU ARE COMMANDED to produce and permit inspection and copying of the documents or
　　objects listed in the attached Schedule B at the place, date, and time specified below.

| PLACE | DATE AND TIME |
|---|---|
| Young Conaway Stargatt & Taylor, LLP<br>c/o Christian Douglas Wright, Esquire<br>The Brandywine Building; 1000 West Street, 17th Floor<br>Wilmington, DE  19801 | May 16, 2005 |

☐　YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

　　Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Christian Douglas Wright* <br>Attorney for Plaintiff | 04/25/05 |

ISSUING OFFICER'S NAME ADDRESS AND PHONE NUMBER
Christian Douglas Wright, Esquire; Young Conaway Stargatt & Taylor, LLP; The Brandywine Building; 1000 West
Street; 17th Floor; P.O. Box 391; Wilmington, DE  19899-0391; (302) 571-6691

(See Rule 45 Federal Rules of Civil Procedure.  Parts C & D on Reverse)

AO88  (Del. Rev. 7/00) Subpoena in a Civil Case

## PROOF OF SERVICE

| | | |
|---|---|---|
| SERVED | DATE 4/25/05 | PLACE 1209 ORANGE ST Wilm DE 19801 |
| SERVED ON (PRINT NAME) KPMG, LLP | | MANNER OF SERVICE By Hand to Brian Penrod at 3:30pm |
| SERVED BY (PRINT NAME) Nick Meadows | | TITLE Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___4/25/05___
DATE

_____
SIGNATURE OF SERVER
Parcels Inc
4E 7th St
Wilm DE 19801
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice tot he person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS

For purposes of this Schedule A to the Subpoena, the following terms shall have the

following meanings:

1.      "$5 Million Adjustment Agreement" means the letter agreement, dated April 25,

2001, concerning a deferral of $5 million of the purchase price for the transaction contemplated

by the Stock Purchase Agreement.

2.      The words "and" as well as "or" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of this Schedule information that might

otherwise be construed to be outside its scope;  the singular shall include the plural and the plural

shall include the singular except as the context may otherwise dictate; the term "any" means

"any and all" and the term "all" means "any and all"; the past tense shall include the present

tense, and vice versa; and the word "including" means "including without limitation."

3.      "Closing Date" has the meaning set forth in Section 12.01 of the Stock Purchase

Agreement.

4.      "Closing Date Certificate" means the Closing Date Certificate provided by Entech

to Defendants on June 29, 2001, as supplemented on July 1, 2001 and July 16, 2001.

5.      "Coal Companies" collectively means Basin Resources, Inc., Horizon Coal

Services, Inc., North Central Energy Company, Northwestern Resources Co., and Western

Energy Company (including its subsidiary Western SynCoal LLC).

6.      "Communication" means any document, oral statement, meeting or conference,

formal or informal, at any time or place and under any circumstances whatsoever, whereby

information of any nature was stated, written, recorded or in any manner transmitted or

transferred and includes any document that abstracts, digests, transcribes or records any communication.

7.     "Credit Agreement" means the $20,000,000 Revolving Credit Facility Credit Agreement dated April 27, 2001 between Westmoreland Mining, the Guarantors and Banks party thereto, and PNC Bank, National Association, as Agent, and any amendments thereto.

8.     "Date" means the exact year, month and date, if known, or, if not, your best approximation thereof.

9.     "Defendants" shall jointly mean Westmoreland Coal and Westmoreland Mining.

10.     "Document" shall have the broadest meaning possible under Federal Rules of Civil Procedure 26 and 34. Further, the word "document" is used in the broad sense and means written, typed, printed, recorded or graphic matter, however produced or reproduced of any kind and description, and whether an original, master, duplicate or copy, including but not limited to, papers, notes of conversations, contracts, electronic mail, computer files, agreements, drawings, telegrams, tape recordings, communications of any kind whatsoever (including inter-office and intra-office memoranda), reports, studies, working papers, corporate records, minutes of meetings (including meetings of boards of directors or committees thereof), notebooks, bank deposit slips, bank checks, canceled checks, diaries, diary entries, appointment books, desk calendars, photographs, transcriptions or sound recordings of any type of personal or telephone conversations or negotiations, meetings or conferences, or things similar to any of the foregoing, and include any data, information or statistics contained within any data storage modules, tapes, discs or other memory device or other information retrievable from storage systems, including but not limited to computer generated reports and print-outs. The word "document" also includes data compilations from which information can be obtained, and translated, if necessary, through

2

detection devices in a reasonably usable form. If any document has been modified by the addition of notations or otherwise, or has been prepared in multiple copies which are not identical, each modification copy or non-identical copy is a separate "document."

11.     "Due Diligence" means any investigation, review, analysis, or other consideration of the Transaction or any aspect thereof, whether financial, legal, regulatory, or otherwise, performed by Defendants or any of their agents or representatives, including any and all advice rendered or provided for accounting or tax purposes by KPMG.

12.     "Entech" means Entech LLC, a Delaware limited liability company, the plaintiff in this action, and the successor of Entech, Inc.

13.     "Financial Materials" means any statements of operation and any financial or accounting information, statements, balance sheets, and reports relating to the Coal Companies, which were provided, exchanged, reviewed, collected, or otherwise utilized in connection with the Transaction or the preparation of the Objections or the Indemnity Notices.

14.     "Guiding Principles Agreement" means the agreement titled Guiding Principles for Calculation of Net Asset Value and Net Revenue Amount, dated April 25, 1001.

15.     "Indemnity Notices" jointly means the Indemnity Notice of Adverse Consequences, dated October 26, 2001, submitted by Westmoreland Coal to Entech, and the Indemnity Notice of Adverse Consequences, dated October 26, 2001, submitted by Westmoreland Mining to Entech.

16.     "Interim Financial Statements" has the meaning set forth in Section 12.01 of the Stock Purchase Agreement.

17.     "Including" means "including, but not limited to;" the term "includes" means "includes, but not limited to."

3

18.    "KPMG" or "your" or "you" means KPMG LLP, a Delaware limited liability partnership, and any and all of its predecessors, subsidiaries, divisions, departments and affiliates, and any of their respective officers, directors, agents, employees, attorneys and/or other representatives.

19.    "June 27, 2001 Report" means the Independent Auditor's Report, dated June 27, 2001 Report, concerning KPMG's audit of the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000.

20.    "Northwestern" means Northwestern Resources Co., one of the Coal Companies and currently a wholly-owned subsidiary of Defendants.

21.    "Objections" means the objections to the Closing Date Certificate originally submitted by Defendants to Entech on July 27, 2001, as subsequently amended and revised (including but not limited to the September 2001 Objections and the November 2001 Objections).

22.    "Parent" means Westmoreland Coal Company, Inc., and any and all of its predecessors, subsidiaries, divisions, departments and affiliates, and any of their respective officers, directors, agents, employees, attorneys and/or other representatives.

23.    "Person" means any individual, natural person, firm, partnership, association, corporation, limited liability company, limited partnership, joint venture, or any other legal, business or governmental entity of any type whatsoever.

24.    "Relate to" or "relating to" mean concerning, regarding, referring to, discussing, supporting, constituting, comprising, containing, evidencing, setting forth, showing, disclosing, describing, explaining, summarizing, reflecting or mentioning, directly or indirectly, in whole or in part.

25.    "Section 338(h)(10) Election" has the meaning set forth in Section 8.09 of the Stock Purchase Agreement.

26.    "Stock Purchase Agreement" means the Stock Purchase Agreement, dated as of September 15, 2000, by and between Westmoreland Coal and Entech, Inc.

27.    "Term Loan Agreement" means the Term Loan Agreement concerning Westmoreland Mining LLC $20,000,000 Floating Rate Senior Guaranteed Secured Notes, Series A, due June 30, 2002 and $100,000,000 9.39% Senior Guaranteed Secured Notes, Series B, due December 31, 2008, dated April 27, 2001, and any amendments thereto.

28.    "Transaction" means the transaction contemplated by the Stock Purchase Agreement, the Guiding Principles Agreement, the $5 Million Adjustment Agreement, and any documents and agreements related thereto.

29.    "Transaction Financing Agreements" means the Credit Agreement, the Term Loan Agreement, and the related documents filed as Exhibits 99.2, 99.3, 99.4, 99.5, 99.6, 99.7, 99.8, 99.9, 99.10, and 99.11 to the Form 8-K filed by Westmoreland Coal on May 15, 2001.

30.    "WECO" means Western Energy Company, one of the Coal Companies and currently a wholly-owned subsidiary of Defendants.

31.    "Westmoreland Mining" means Westmoreland Mining LLC, a wholly-owned subsidiary of Westmoreland Coal, and any and all of its predecessors, subsidiaries, divisions,

WP3:1105436.3    062207.1001

departments and affiliates, and any of their respective officers, directors, agents, employees, attorneys and/or other representatives.

## TOPICS

1.    Any work performed or advice provided by KPMG with respect to the Transaction, including but not limited to any Due Diligence performed by Defendants or KPMG in connection with the Transaction (whether such Due Diligence was performed prior to the execution of the Stock Purchase Agreement or up through to the Closing Date).

2.    Any work performed or advice provided by KPMG with respect to the Objections.

3.    Any work performed or advice provided by KPMG with respect to the Indemnity Notices.

4.    Any work performed or advice provided by KPMG with respect to the Financial Materials, including but not limited to KPMG's evaluation of the Financial Materials.

5.    Any work performed or advice provided by KPMG with respect to the Closing Date Certificate, including but not limited to KPMG's evaluation of the Closing Date Certificate, the accuracy of the Closing Date Certificate.

6.    Any work performed or advice provided by KPMG with respect to the Interim Financial Statements, including but not limited to KPMG's evaluation of the Interim Financial Statements.

7.    Any work performed or advice provided by KPMG with respect to the Transaction Financing Agreements.

6

8.      Any work performed or advice provided by KPMG with respect to any valuation of the Coal Companies, whether such valuation is directed to any of the Coal Companies separately (including any subsidiaries thereof) or to the Coal Companies as a group.

9.      The accounting and tax treatment, methods, or procedures used by Defendants or KPMG with respect to the evaluation of the Financial Materials, the Closing Date Certificate, or the Interim Financial Statements.

10.     Any estimates of materiality made by KPMG in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

11.     Any work performed or advice provided by KPMG with respect to the deferred tax assets, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

7

12. Any work performed or advice provided by KPMG with respect to liability for final reclamation activities at the Jewett mine, in connection with any review, evaluation, or audit of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

13. Any work performed or advice provided by KPMG with respect to post-retirement medical benefits liabilities of WECO, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

14. Any work performed or advice provided by KPMG with respect to the exploration costs deferred on Northwestern's balance sheet ($2,428,175 as of December 31, 2000), in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report,

(ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

15. Any work performed or advice provided by KPMG with respect to the $1,864,102 in exploration costs deferred on WECO's balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

16. Any work performed or advice provided by KPMG with respect to the advance royalties on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

17. Any work performed or advice provided by KPMG with respect to the $1,667,846 base reclamation receivable for the Jewett mine on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired

9

and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

18.    Any work performed or advice provided by KPMG with respect to the $12,499,409 final reclamation receivable for the Jewett mine on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

19.    Any work performed or advice provided by KPMG with respect to the $1,538,290 in Area C overburden removal costs for the Rosebud mine deferred on the WECO balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-

WP3:1105436.3                                      062207.1001

year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or

(ii) Westmoreland Coal's consolidated financial statements for the years ending December 31,

2001, 2002, 2003, or 2004.

     20.    Any work performed or advice provided by KPMG with respect to the $121,828

in advance royalties relating to the Dew Property on the Northwestern balance sheet, in

connection with any review, evaluation, or audit of any of (i) the consolidated statements of

assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as

of December 31, 2000 and December 31, 1999, and the related consolidated statements of

revenues and expenses of the Montana Power Coal Division for each of the years in the three-

year period ended December 31, 2000, as set forth in the June 27, 2001 Report,

(ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or

2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending

December 31, 2001, 2002, 2003, or 2004.

     21.    Any work performed or advice provided by KPMG with respect to reclamation

receivables and reclamation liabilities, in connection with any review, evaluation, or audit of any

of Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or

2004.

     22.    Any work performed or advice provided by KPMG with respect to the

$10,202,940 write off taken by Northwestern after its acquisition by Defendants, in connection

with any review, evaluation, or audit of any of (i) Northwestern's financial statements for the

year ending December 31, 2001, or (ii) Westmoreland Coal's consolidated financial statements

for the year ending December 31, 2001.

11

23.    Any work performed or advice provided by KPMG with respect to the $163,106 in slurry inventory at WECO, in connection with any review, evaluation, or audit of any of the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

24.    Any work performed or advice provided by KPMG with respect to the $1,175,000 in deferred overburden removal costs as of December 31, 2002, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2002.

25.    Any work performed or advice provided by KPMG with respect to the $3,874,000 in deferred overburden removal costs as of December 31, 2003, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2003.

26.    Any work performed or advice provided by KPMG with respect to the $5,728,000 in deferred overburden removal costs as of December 31, 2004, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2004.

27.    Any work performed or advice provided by KPMG with respect to the Montana Power Coal Division's Consolidated Statements of Assets Acquired and Liabilities Assumed as of March 31, 2001 (unaudited).

12

28.    Any work performed or advice provided by KPMG with respect to the Montana Power Coal Division's Consolidated Statements of Revenues and Expenses for the three months ended March 31, 2001 (unaudited).

29.    The accounting and tax treatment, methods, or procedures used by Defendants or KPMG with respect to the Coal Companies from April 30, 2001 to the present day, including but not limited to any management representation letters, internal workpapers related to Defendants' audited financial statements, and tax returns and related workpapers.

30.    Defendants' or KPMG's disclosures to third Persons (including, but not limited to, Persons providing banking or financing advice or services to Defendants) in which Defendants or KPMG have included, referred to, or incorporated, in whole or in part, the Financial Materials, the Closing Date Certificate, the Interim Financial Statements, or any information contained therein.

31.    Any work performed or advice provided by KPMG in connection with the calculation or evaluation of any pension transfer payments contemplated by Section 5.04(g) of the Stock Purchase Agreement.

32.    The Section 338(h)(10) Election, including but not limited to any related purchase accounting documents.

062207.1001

## SCHEDULE B

## INSTRUCTIONS

1.    This Subpoena applies to all documents in your possession, custody or control, wherever located.

2.    References in this Subpoena to any person or entity shall include the person or entity and his, her, or its present and former corporate parents, predecessors in interest, successors in interest, shareholders, divisions, departments, subsidiaries, branches, affiliates, and its present and former officers, directors, executives, employees, partners, agents, principals, attorneys, trustees, representatives, and other persons acting or purporting to act on his, her, or its behalf.

3.    If, in responding to this Subpoena, you claim any ambiguity in interpreting a request, or any applicable definition or instruction, you may not utilize that claimed ambiguity as a basis for refusing to respond.  Rather, you shall set forth as part of your response the language deemed ambiguous, and the interpretation you used in responding to that request.

4.    A request for a document shall be deemed to include a request for the original and final versions of the document, all drafts, alterations, modifications, changes and amendments thereto, as well as all non-identical copies or drafts of such documents, including any copy bearing non-identical markings or notations of any kind, as well as and all transmittal sheets, cover letters, exhibits, enclosures or attachments to the document.

5.    Any document described herein is to be produced as it is kept in the ordinary course of business, in its original file folder, with all labels or similar markings intact, and with the name of the Person from whose files it was produced.  Documents stored electronically shall

be produced in electronic format as stored and/or copied exactly onto medium such as diskettes, "Zip" disks, CD-ROM, DVD-ROM, or the like.

6.     In the event that any responsive document is maintained in computer-readable form, such document shall be produced: (i) in hard copy form, in a format generally used in the ordinary course of business; and (ii) on disk, tape, or other computer storage medium, with instructions necessary to convert the information into reasonably usable form (including the name and version number of the program used to create or read the data).

7.     Each request herein should be construed independently and not with reference to any other request for the purpose of limitation.

8.     If it is not possible to produce any document called for by this Request, or if any part of this Request is objected to, the reasons for the failure to produce the documents or the objection should be stated specifically as to all grounds.

9.     If a document responsive to any request is no longer in your possession, custody or control, state what disposition was made of the document and the date of such disposition, and identify all Persons having knowledge of the document's contents.

10.     If a document responsive to any request is no longer in your possession, but a copy of said document has been maintained by your agent, advisor or consultant (such as, but not limited to, any of your accountants, auditors, attorneys, financial advisors, or experts), include such document in your production.

11.     If any document responsive to any request has been destroyed, set forth the content of said document, the location of any copies of said document, the date of such destruction and the name of the Person who destroyed the document or ordered or authorized such destruction.

2

12.    If you claim any form of privilege or protection or other reason, whether based on statute or otherwise, as a ground for not producing requested documents, furnish a list identifying each document for which the privilege or protection is claimed, together with the following information:

    (a)    type of document(s) (e.g., memorandum, letter);

    (b)    date of the document(s);

    (c)    length of the document(s);

    (d)    author or sender of document(s);

    (e)    addressee and all other Persons to whom copies of the document(s) were furnished, together with their job titles;

    (f)    general subject matter of the document(s);

    (g)    basis for withholding the document(s); and

    (h)    the specific Request to which such document(s) is (are) responsive.

13.    When one writing is responsive to more than one specific request, only one identical copy of the writing need be produced.

14.    Any documents responsive to any request which you deem to be confidential will be maintained as confidential pursuant to the terms of District of Delaware Local Rule 26.2, which provides that until such time as an appropriate protective order is in effect, production of confidential information is limited to members and employees of trial counsel who have entered an appearance in the litigation and who have, where appropriate, been admitted pro hac vice, with such persons being obligated to keep such documents confidential and use them only for purposes of litigating the case. Once an appropriate protective order is in effect, any confidential documents produced will be subject to the protections provided by that protective order.

WP3:1105436.3  062207.1001

15.    Unless otherwise specified, the relevant time period applicable to these document requests is January 1, 1999 to present.

## DEFINITIONS

For purposes of this Schedule B, the definitions set forth in Schedule A shall control.

## DOCUMENTS TO BE PRODUCED

1.    All documents or communications relating to the Transaction, including but not limited to any Due Diligence performed by Defendants or KPMG in connection with the Transaction (whether such Due Diligence was performed prior to the execution of the Stock Purchase Agreement or up through to the Closing Date).

2.    All documents or communications relating to the Objections.

3.    All documents or communications relating to the Indemnity Notices.

4.    All documents or communications relating to the Financial Materials, including but not limited to Defendants' or KPMG's evaluation of the Financial Materials, the accuracy of the Financial Materials, or the facts underlying any purported inaccuracies in the Financial Materials.

5.    [All documents or communications relating to the Closing Date Certificate, including but not limited to Defendants' or KPMG's evaluation of the Closing Date Certificate, the accuracy of the Closing Date Certificate, or the facts underlying any purported inaccuracies in the Closing Date Certificate.]

6.    All documents or communications relating to the Interim Financial Statements, including but not limited to Defendants' or KPMG's evaluation of the Interim Financial Statements, the accuracy of the Interim Financial Statements, Defendants' reliance on the Interim

4

Financial Statements, or the facts underlying any purported inaccuracies in the Interim Financial Statements.

7.    All documents or communications relating to the Transaction Financing Agreements.

8.    All documents or communications relating to any valuation of the Coal Companies, whether such valuation is directed to any of the Coal Companies separately (including any subsidiaries thereof) or to the Coal Companies as a group, and without regard to whether such valuation was performed by or at the request or direction of Defendants or KPMG.

9.    All documents or communications relating to the accounting and tax treatment, methods, or procedures used by Defendants or KPMG with respect to the evaluation of the Financial Materials, the Closing Date Certificate, or the Interim Financial Statements.

10.    All documents or communications relating to any estimates of materiality made by KPMG in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

11.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the deferred tax assets, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities

WP3:1105436.3                                                                                      062207.1001

assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

12.    All documents or communications relating to any work performed or advice provided by KPMG with respect to liability for final reclamation activities at the Jewett mine, in connection with any review, evaluation, or audit of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

13.    All documents or communications relating to any work performed or advice provided by KPMG with respect to post-retirement medical benefits liabilities of WECO, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

WP3:1105436.3                                                                                          062207.1001

14.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the exploration costs deferred on Northwestern's balance sheet ($2,428,175 as of December 31, 2000), in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

15.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $1,864,102 in exploration costs deferred on WECO's balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

16.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the advance royalties on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as

7

of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

17.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $1,667,846 base reclamation receivable for the Jewett mine on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

18.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $12,499,409 final reclamation receivable for the Jewett mine on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June

8

27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

19.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $1,538,290 in Area C overburden removal costs for the Rosebud mine defereed on the WECO balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

20.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $121,828 in advance royalties relating to the Dew Property on the Northwestern balance sheet, in connection with any review, evaluation, or audit of any of (i) the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, (ii) Northwestern's financial statements for the year ending December 31, 2001, 2002, 2003, or 2004, or (iii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

WP3:1105436.3

062207.1001

21.    All documents or communications relating to any work performed or advice provided by KPMG with respect to reclamation receivables and reclamation liabilities, in connection with any review, evaluation, or audit of any of Northwestern's financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

22.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $10,202,940 write off taken by Northwestern after its acquisition by Defendants, in connection with any review, evaluation, or audit of any of (i) Northwestern's financial statements for the year ending December 31, 2001, or (ii) Westmoreland Coal's consolidated financial statements for the year ending December 31, 2001.

23.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $163,106 in slurry inventory at WECO, in connection with any review, evaluation, or audit of any of the consolidated statements of assets acquired and liabilities assumed of the Montana Power Coal Division and subsidiaries as of December 31, 2000 and December 31, 1999, and the related consolidated statements of revenues and expenses of the Montana Power Coal Division for each of the years in the three-year period ended December 31, 2000, as set forth in the June 27, 2001 Report, or (ii) Westmoreland Coal's consolidated financial statements for the years ending December 31, 2001, 2002, 2003, or 2004.

24.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $1,175,000 in deferred overburden removal costs as of December 31, 2002, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2002.

062207.1001

25.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $3,874,000 in deferred overburden removal costs as of December 31, 2003, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2003.

26.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the $5,728,000 in deferred overburden removal costs as of December 31, 2004, in connection with any review, evaluation, or audit of Northwestern's financial statements for the year ending December 31, 2004.

27.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the Montana Power Coal Division's Consolidated Statements of Assets Acquired and Liabilities Assumed as of March 31, 2001 (unaudited).

28.    All documents or communications relating to any work performed or advice provided by KPMG with respect to the Montana Power Coal Division's Consolidated Statements of Revenues and Expenses for the three months ended March 31, 2001 (unaudited).

29.    All documents or communications relating to the accounting and tax treatment, methods, or procedures used by Defendants or KPMG with respect to the Coal Companies from April 30, 2001 to the present day, including but not limited to any management representation letters, internal workpapers related to Defendants' audited financial statements, and tax returns and related workpapers.

30.    All documents or communications relating to Defendants' or KPMG's disclosures to third Persons (including, but not limited to, Persons providing banking or financing advice or services to Defendants) in which Defendants or KPMG have included, referred to, or

062207.1001

incorporated, in whole or in part, the Financial Materials, the Closing Date Certificate, the Interim Financial Statements, or any information contained therein.

31.     All documents or communications relating to any work performed or advice provided by KPMG in connection with the calculation or evaluation of any pension transfer payments contemplated by Section 5.04(g) of the Stock Purchase Agreement.

32.     All documents or communications relating to the Section 338(h)(10) Election, including but not limited to any related purchase accounting documents.

33.     Documents sufficient to set forth or reflect KPMG's document retention policies applicable to documents or communications subject (or that would otherwise have been subject) to this subpoena, from 2000 to the present.

34.     Documents sufficient to set forth or reflect KPMG's retention policies applicable to electronic mail and other electronic data and information subject (or that would otherwise have been subject) to this subpoena, from 2000 to the present.

12

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, hereby certify that on April 27, 2005, I caused a copy of the foregoing **Notice of Subpoena** (KPMG, LLP) to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification to counsel of record, as indicated below. I further certify that I caused a copy of the foregoing to be served upon the parties in the manner indicated.

Christian Douglas Wright (No. 3554)

Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
*By Hand Delivery/Electronic Notification*

Christopher A. Ward, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
*By Hand Delivery/Electronic Notification*

John G. Hutchinson, Esq.
Sidley Austin Brown & Wood LLP
787 Seventh Avenue
New York, NY 10019
*By E-Mail (jhutchinson@sidley.com)*

C. MacNeil Mitchell, Esq.
Piero A. Tozzi, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
*By First Class Mail*

Rolf S. Woolner, Esq.
Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543
*By First Class Mail*