IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| TOUCH AMERICA HOLDINGS, INC., et al., ) | Bk. No. 03-11915 (KJC) |
| ) | |
| Debtors. ) | Jointly Administered |
| ENTECH LLC, ) | |
| ) | Adv. No. 04-52935 (KJC) |
| Plaintiff, ) | |
| ) | |
| OFFICIAL COMMITTEE OF UNSECURED ) | |
| CREDITORS, ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | C.A. No. 04-1336-SLR |
| ) | |
| WESTMORELAND COAL COMPANY, ) | |
| a Delaware corporation, and ) | |
| WESTMORELAND MINING LLC, ) | |
| a Delaware limited liability company, ) | |
| ) | |
| Defendants. ) | |

**REPLY BRIEF IN SUPPORT OF
PLAINTIFF ENTECH LLC'S MOTION TO COMPEL**

WINSTON & STRAWN LLP
C. MacNeil Mitchell
Piero A. Tozzi
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700

Rolf S. Woolner
333 South Grand Avenue
Los Angeles, CA 90071-1543
(213) 615-1700

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Christian Douglas Wright (No. 3554)
Matthew B. McGuire (No. 4366)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Co-counsel to the Plaintiff

DATED: May 26, 2005

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 3

    I.    WESTMORELAND HAS NOT FULFILLED ITS OBLIGATION TO PRODUCE NON-PRIVILEGED DOCUMENTS RESPONSIVE TO ENTECH'S REQUEST FOR PRODUCTION NO. 9 ................................................................................. 3

CONCLUSION ............................................................................................................................. 9

## TABLE OF AUTHORITIES

**Page**

*Clearview Concrete Prods. v. S. Charles Gehrardt, Inc.*,
    88 A.D.2d 461 (App. Div. 2d Dep't 1982) .................................................................3

*Newman v. Salamander Indus. Prods., Inc.*,
    1999 Ohio App. LEXIS 1667 (Ohio Ct. App. Apr. 16, 1999),
      *appeal denied*, 715 N.E.2d 568 (Ohio 1999). .............................................................4

## PRELIMINARY STATEMENT

There is only one issue addressed in Westmoreland's Memorandum of Law[1] in opposition to Entech's Motion to Compel that has any bearing on the motion – the discoverability of post-closing valuations of the Coal Companies sought by Entech's Request for Production No. 9. As to that issue, as will be explained in the Argument section, the information sought is relevant (or at least likely to lead to the discovery of admissible evidence) because it goes to the nature of what Westmoreland must prove in this case in order to be able to recover damages for Entech's alleged breaches of the Stock Purchase Agreement, and to Entech's claim against Westmoreland for breach of the implied covenant of good faith and fair dealing.

With respect to the remaining matters discussed in the other 16 pages of Westmoreland's 18-page answering brief, Entech will not burden the Court with a point-by-point rebuttal of Westmoreland's one-sided and erroneous presentation of the "facts" as to how discovery has proceeded in this case. While Entech disagrees with Westmoreland's assertions, the more important point is that these assertions have nothing to do with the matter before the Court on the motion to compel, save perhaps for Westmoreland's claim that Entech acted precipitately in filing the motion to compel and failed to negotiate with Westmoreland in an effort to narrow the scope of the discovery dispute.

As to that latter point, the facts simply do not bear Westmoreland's claim out. Entech had no desire to file the motion to compel. But following the parties' second

---

[1]  Referred to herein as "Answering Brief" and cited as "AB at __."

meet-and-confer on April 25 – during which counsel for Westmoreland stated that they were unwilling to continue discussing the discovery disputes, and gave absolutely no indication that they thought that further discussions would be fruitful – Entech had little choice but to move to compel, with the June 30 discovery cut-off just two months away.

Indeed, it was nearly one month from the time Entech first attempted to schedule a meet-and-confer (during the week of April 11) before Westmoreland finally agreed (on May 11) to produce the bulk of what Entech was seeking.[2] And in the nearly two weeks between the filing of the motion to compel on April 29 and the parties' third meet-and-confer on May 11, Westmoreland never attempted to continue discussing the discovery dispute with Entech. It was only after an express invitation by Entech to continue the dialogue, combined with the impending deadline for Westmoreland to file its answering brief, that Westmoreland agreed to resume discussions and finally took positions it could have taken weeks before and avoided the need for much of the motion to compel. Under these circumstances, Entech did not act with inappropriate haste.[3]

---

[2] While Westmoreland did agree on May 11 to produce documents it has not, as of the filing of this brief more than two weeks later, and notwithstanding repeated inquiries from Entech, actually produced any additional documents.

[3] A second item from Westmoreland's answering brief is also worth noting, although it is not germane to the motion to compel. Count 7 of Entech's First Amended Complaint seeks a judgment from this Court that any affirmative award to Westmoreland is subject to the mandatory subordination provisions of Section 510(b) of the Bankruptcy Code because Westmoreland's claims for damages arise out of the purchase or sale of a security (through the Stock Purchase Agreement) of an affiliate (the Coal Companies) of the debtor (Entech). (See First Amended Complaint at 11-12.) During the scheduling conference last fall, Entech sought Westmoreland's agreement to seek to have the Court entertain dispositive motions, specifically identifying the Section 510(b) subordination claim as a purely legal issue that would be appropriate for dispositive motion practice. Counsel for Westmoreland refused, saying that there might be questions of fact that would have to be explored. Now, at footnote 6 on page 8 of its answering brief, Westmoreland states that the "statutory and equitable subordination remedies" sought by

# ARGUMENT

I. **WESTMORELAND HAS NOT FULFILLED ITS OBLIGATION TO PRODUCE NON-PRIVILEGED DOCUMENTS RESPONSIVE TO ENTECH'S REQUEST FOR PRODUCTION NO. 9**

Westmoreland's opposition to Entech's motion to compel on Request for Production No. 9 misses the point. This case is not, as Westmoreland claims, about Entech's accounting. It is true, of course, that this case *involves* Entech's accounting – but it is not *about* the accounting. Rather, this case is (among other things) about the measure of damages, and Westmoreland's ability to prove damages. Entech seeks the valuation materials, not because there is something to be gained by proving that Westmoreland's valuations were incorrect (*cf.* AB at 14), but because Section 10.01 of the Stock Purchase Agreement provides that in order for Westmoreland to be entitled to indemnification from Entech, it must have suffered "Adverse Consequences" (damages), and the valuation materials sought are directly relevant to (or reasonably likely to lead to the discovery of admissible evidence on) whether Westmoreland has suffered damages. Without damages, Westmoreland has no claim for recovery irrespective of the appropriateness of Entech's accounting.

It is well-settled under New York law (which governs the Stock Purchase Agreement) that the measure of damages for a breach of warranty claim is the difference between the actual value of the investment and the value it would have had absent the alleged breach. *See, e.g., Clearview Concrete Prods. v. S. Charles Gehrardt, Inc.*, 88 A.D.2d 461, 469 (App. Div. 2d Dep't 1982) (identifying this as the "benefit of the

---

Entech are purely legal issues – presumably meaning that no fact discovery is necessary in order to resolve the merits of those claims.

bargain" rule). Thus, where it is alleged that there was a breach of warranty in an agreement for the purchase of all of a company's stock, the fact that the structure of the transaction was a stock sale makes it "appropriate to inquire whether a particular breach affected the value of the company's stock, and not merely to subtract the actual value of a particular asset from its warranted value." *Newman v. Salamander Indus. Prods., Inc.*, 1999 Ohio App. LEXIS 1667, at *10 (Ohio Ct. App. Apr. 16, 1999) (applying New York law), *appeal denied*, 715 N.E.2d 568 (Ohio 1999). Accordingly, in the context of a stock purchase agreement, it was not sufficient for the buyer to show "that a particular asset was actually worth less than [the seller] had warranted if it could not also demonstrate that the diminution in the value of that asset had the additional effect of decreasing the value of the stock." *Id.*, at *8. Absent a showing that by reason of the alleged breach the value of the stock received was lower than the amount paid, under New York law the buyer "received the benefit of its bargain and suffered no damage." *Id.*, at *9.

In other words, as Entech noted in its moving papers, a central question is whether Westmoreland got what it paid for (*see* Opening Brief at 16). The value Westmoreland has ascribed to the Coal Companies following the closing is relevant, or at least potentially so, to the question of how much the Coal Companies were really worth. If the Coal Companies really were worth $138 million, then Westmoreland has suffered no damages. The measure of damages in this case is not, as Westmoreland continues to assume (*see, e.g.*, Response to Interrogatory No. 7, attached as Exhibit D to Entech's Opening Brief), a dollar-for-dollar equivalency with the amount of any alleged accounting error. It is simply not enough for Westmoreland to try to prove that Entech did not follow GAAP (as the term is very specifically limited in the Stock Purchase

4

Agreement)[4] with respect to any of the disputed accounting entries – Westmoreland must prove that it has been damaged, and it must prove by how much. And Entech has the right to obtain documents to defend against any damages claims Westmoreland asserts.

In the context of a stock purchase agreement such as that which gave rise to this case, representations and warranties perform at least three functions: (1) they assist a buyer in understanding the business it is purchasing; (2) they may be used to establish damages if the seller makes inaccurate representations; and (3) they allow the buyer to abort the transaction if it finds the seller's representations incorrect before closing. The key item in these factors for this case is what damage, if any, Westmoreland sustained, even if Entech's accounting was incorrect or inconsistent. Westmoreland would not be damaged if it did not rely on Entech's financial statements or accounting methods in determining the purchase price and instead, for example, estimated recoverable reserves of coal at a specific value. Therefore, the methods and bases for Westmoreland's purchase price offer, subsequent valuations, and documents used to arrive at the valuations are relevant to Westmoreland's claims. And to the extent that the valuation materials show that Westmoreland knew that the stock it had purchased had a value of $138 million (or more) – and thus got the benefit of its bargain –

---

[4] Moreover, not only does Westmoreland fail to acknowledge that "GAAP" as used in the Stock Purchase Agreement has a specified meaning (*see* SPA § 12.01(a)), Westmoreland refers to only a small portion of the representation and warranty made by Entech in Section 2.08(a) of the Stock Purchase Agreement. The actual representation and warranty is that specified financial statements (including the Interim Financial Statements) were, except as set forth in the notes to those financial statements and as disclosed in a schedule to the Stock Purchase Agreement, "prepared in accordance with GAAP [defined as "U.S. generally accepted accounting principles, consistently applied throughout the specified period and in the immediately prior comparable period"] and fairly present in all material respects the consolidated financial condition and statement of operations of the [Coal] Companies and its consolidated subsidiaries as of the respective dates thereof and for the respective periods covered thereby."

WP3:1114033.7                                                                                               062207.1011

that information is relevant to Entech's claim for breach of the implied covenant of good faith and fair dealing.

A specific example of just one of the objections Westmoreland has asserted with respect to Entech's accounting demonstrates why the valuation information is relevant to Westmoreland's claims. Westmoreland has objected to a deferred tax asset, valued at $11,373, for certain deferred post-retirement and post-employment benefits for Western Energy Company. Westmoreland claims that Entech violated GAAP in failing to exclude this deferred tax asset from the Net Asset Value of the Coal Companies, and asserts that this violation of GAAP has cause Westmoreland $11,373 in damages. But as Entech pointed out in its Opening Brief (at pages 22-23), Westmoreland's election under Section 338(h)(10) of the Internal Revenue Code reset the books of the Coal Companies and wiped out the deferred tax assets, so Entech's prior accounting for the deferred tax assets could not have affected the value of the Coal Companies, or Westmoreland.

Westmoreland anticipated making the Section 338(h)(10) election when it entered into the Stock Purchase Agreement, so when it was deciding what it would pay for the stock of the Coal Companies it could not have reasonably assigned any value to the deferred tax assets in determining the price it was willing to pay for the Coal Companies. If the prior accounting for the deferred tax assets could have no effect on the value of the Coal Companies in Westmoreland's hands following the Section 338(h)(10) election, then Westmoreland cannot have suffered any damages for purported GAAP violations arising from that accounting. Westmoreland's valuations of Western Energy Company, and the value Westmoreland assigns to the deferred tax assets, both at the time of closing

and afterward, are relevant to Westmoreland's ability to prove that it has been damaged on account of an alleged GAAP accounting violation.

Finally, there is more than a little irony in Westmoreland's assertion that post-closing valuation materials for the Coal Companies are not relevant, given that the nature of Westmoreland's affirmative indemnification claims are premised on a similar after-the-fact examination of subsequent results of operations and financial positions of the Coal Companies. Westmoreland is perfectly willing to look to subsequent results of operations and financial positions of the Coal Companies in finding liabilities to try to attribute to Entech (for example, with respect to Entech's estimations as to the collectibility of receivables or the amount of environmental remediation costs), but is unwilling to produce documents to Entech that allow Entech to test the methods by which Westmoreland arrived at those conclusions (continuing with the example, to test whether Westmoreland used appropriate assumptions in estimating that receivables are uncollectible or remediation costs were incorrectly calculated by Entech).

Westmoreland's hypothetical example on page 15 of the Answering Brief proves this point. In describing a representation of "no environmental liability" which turns out to be false and costs Westmoreland $1 million, what is necessarily subsumed within that example (but not acknowledged by Westmoreland) is that in order to establish a loss caused by the hypothetical breach of the "no environmental liability" representation, Westmoreland has to look at post-closing valuations of the Coal Companies in order to determine how much damage the hypothetical falsity of the "no environmental liability" representation actually caused. In other words, Westmoreland cannot prove its claim of $1 million in damages for breach of that representation unless it can show that the Coal

7

Companies are worth $1 million less because of the breach of that representation. If Westmoreland is entitled to rely upon such theories in pursuit of its damages, Entech is entitled to discovery to test the validity (or lack thereof) of those theories.[5]

★   ★   ★

---

[5]  Westmoreland also has an independent obligation under the Stock Purchase Agreement to provide the valuation information to Entech. Section 10.02(c) of the Stock Purchase Agreement provides that Westmoreland will give Entech reasonable access to the "Books and Records" of the Coal Companies "in connection with the matters for which indemnification is sought" provided that Entech "reasonably deems" that information to be "necessary in connection with its rights and obligations" under the indemnification provisions. (Stock Purchase Agreement, Section 10.02(c).) "Books and Records" are defined in Section 12.01(a) of the Stock Purchase Agreement to include all documents "relating to the Business or Condition of the [Coal] Companies."

## CONCLUSION

Request for Production No. 9 seeks information that is relevant to claims or defenses to claims in this case or is reasonably calculated to lead to the discovery of admissible evidence. Entech respectfully requests that its Motion to Compel be granted as to Request for Production No. 9.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Christian Douglas Wright

Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Christian Douglas Wright (No. 3554)
Matthew B. McGuire (No. 4366)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
cwright@ycst.com

-and-

WINSTON & STRAWN LLP
C. MacNeil Mitchell
Piero A. Tozzi
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700

Rolf S. Woolner
333 South Grand Avenue
Los Angeles, CA 90071-1543
(213) 615-1700

Co-counsel to the Plaintiff

DATED: May 26, 2005

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2005, I caused to be electronically filed a true and correct copy of *Reply Brief in Support of Plaintiff Entech LLC's Motion to Compel* with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Laurie Selber Silverstein, Esquire
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street
>Wilmington, DE 19801

I further certify that on May 26, 2005, I caused a copy of the *Reply Brief in Support of Plaintiff Entech LLC's Motion to Compel* to be served by hand-delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY FEDEX**

>John G. Hutchinson, Esquire
>Sidley Austin Brown & Wood LLP
>787 Seventh Avenue
>New York, NY 10019

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Christian Douglas Wright*
Christian Douglas Wright (No. 3554)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
cwright@ycst.com

*Attorneys for Entech LLC*